IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs September 19, 2018

## DALE SAMUEL WAGGONER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1104    Cheryl A. Blackburn, Judge**

_____

### No. M2017-02251-CCA-R3-PC

_____

The petitioner, Dale Samuel Waggoner, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and TIMOTHY L. EASTER, J., joined.

Kara L. Everett, Carthage, Tennessee, for the appellant, Dale Samuel Waggoner.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

After robbing a Mapco Gas Station on January 20, 2011, the petitioner was convicted of aggravated robbery and entered a best interest plea to possession of a handgun by a convicted felon.  The trial court imposed an effective eighteen-year sentence, and the petitioner challenged the sufficiency of the evidence supporting his convictions on direct appeal.  This Court summarized the underlying facts leading to the petitioner's convictions as follows:

John Dellar testified that he was working the 10:00 p.m. to 6:00 a.m. shift on January 20, 2011, at the Mapco when he noticed a dark-colored, four-door SUV outside the front door at about 1:30 a.m. A man got out of the passenger side, walked around the vehicle, and talked to the driver for about a minute before coming inside the store. Dellar described the man as African-American, about six feet tall, and wearing black pants, black shirt, a black or dark blue hooded coat with fur around the hood, and a baseball cap. The man then walked up to the cash register and told Dellar, "[G]ive me all the mother-f* * * * * * money." The man pulled up his black shirt, revealing a white T-shirt underneath, and retrieved a black automatic pistol with red sights from the front of his pants, which he pointed at Dellar. Dellar took the cash drawer out of the register and placed it on the counter. The man removed the money from the drawer, about $41 and some change, as well as a $2 bill stamped with the Mapco store number, and put it in his pants pocket. The man also took a carton of Newport cigarettes. The man then left and ran south through the parking lot. Dellar locked the door and called 9-1-1. He gave a description of the robber and the suspect vehicle to the 9-1-1 dispatcher, and the police arrived about ten minutes later. Dellar identified the $2 bill bearing the Mapco's store number, which was admitted as an exhibit. A copy of the store's surveillance video was played for the jury.

Dellar acknowledged that, at a preliminary hearing, he identified co-defendant Deonte Davis as the robber. Dellar explained that Davis had been in the store a few days before the robbery and had a confrontation with the manager. As a result, Davis' picture had been hung up in the manager's office after the robbery to inform the employees that Davis was not allowed in the store. Dellar believed that he identified Davis as the robber because "his face was very familiar looking at it every night."

Sergeant Josh Blaisdell of the Metropolitan Nashville Police Department ("MNPD") testified that he was about one mile from the Mapco when he was dispatched to a robbery in progress at 1:34 a.m. About thirty seconds to a minute later, he noticed a vehicle matching the description of the suspect SUV parked in the vacant lot of a nearby strip mall. When the SUV pulled onto Old Hickory Boulevard, Sergeant Blaisdell followed in his unmarked police vehicle and attempted to make a traffic stop by activating his blue lights. The SUV accelerated, and Sergeant Blaisdell activated his siren. When the SUV did not stop, Sergeant Blaisdell pursued it at speeds of sixty to seventy miles per hour down Old Hickory Boulevard for about a mile. After the vehicle crossed

- 2 -

the intersection of Bell Road, which came to a dead end, it "went off into the woods and hit a tree." The driver, whom Sergeant Blaisdell later learned was Tiwon Harvell, jumped out and fled into the woods. Sergeant Blaisdell approached the vehicle and found the [petitioner], who was wearing a black shirt, in the front passenger seat and another individual, later identified as Deonte Davis, in the backseat. The [petitioner] and Davis were taken into custody. Sergeant Blaisdell saw a baseball cap and a handgun on the front passenger floorboard, a carton of Newport cigarettes near the center console, and some cash underneath the driver's seat. About five minutes later, Harvell was apprehended and taken into custody.

MNPD Officer Greg Blackburn testified that he, in his marked police vehicle with emergency equipment activated, joined in Sergeant Blaisdell's pursuit of the suspect vehicle down Old Hickory Boulevard. After the suspect vehicle crashed into a tree, the driver jumped out and ran through the wood line. As Officer Blackburn and Sergeant Blaisdell approached the vehicle, they discovered the [petitioner] in the front passenger seat and Deonte Davis in the middle row seat of the SUV. The [petitioner] and Davis were taken into custody, and Officer Blackburn noticed a black handgun on the floorboard of the front passenger seat in plain view. Officer Blackburn bagged and labeled the coins, including thirty-nine quarters, sixty-nine dimes, and eleven nickels, recovered from the [petitioner's] person. Officer Blackburn said that a $2 bill was also recovered from the scene. Officer Blackburn said that he noted in his offense report that the [petitioner] was wearing a black, hooded jacket, black pants, and a black shirt.

MNPD Officer Michael McCord testified that he responded to the scene of the crash and took the [petitioner], who was in the passenger's seat, into custody. Officer McCord patted down the [petitioner] to check for weapons and noticed that he had "pockets full of coin change."

Detective Eric Harrison of the MNPD testified that when he arrived at the scene of the crash, the [petitioner] and Davis were in custody and Harvell was missing. As he approached the suspect vehicle, he noticed a handgun with red sights on the floorboard of the passenger side. He also saw an opened carton of Newport cigarettes and unopened packs of cigarettes scattered throughout the vehicle.

Officer Daniel Turner of the MNPD testified that when he arrived at the scene where the suspect vehicle had crashed, Sergeant Blaisdell advised

- 3 -

him that the driver had fled the area and gave him a description of the flight direction. Officer Turner then drove up Bell Road and subsequently apprehended Harvell, who was wearing a black sweatshirt and black pants, as he "came running out . . . of the woods."

Rhonda Evans, a crime scene technician with the MNPD, testified that she responded to the scene of the crashed suspect vehicle and made photographs and collected items of evidence. Inside the vehicle, she saw a handgun on the front passenger floorboard, an opened carton of Newport cigarettes, and two opened packs of Newport cigarettes. She identified a photograph of the money recovered from the vehicle: a $20 bill, three $5 bills, and six $1 bills, totaling $41. She also identified photographs of the Hi-Point handgun found in the vehicle, as well as the magazine, the rounds removed from the magazine, and a round removed from the chamber. She lifted fingerprints off the carton of Newport cigarettes, the two unopened packs, one opened pack, and the magazine. She was unable to lift any prints off the gun but noticed it had red sights. She explained that it was not unusual to not find any prints on the weapon because the robbery occurred in January when it was "pretty cold." She also identified photographs she made of the [petitioner's] clothing, which included dark-colored pants, a dark-colored, hooded jacket, a white tank top, a black shirt, and black shoes.

On cross-examination, Evans acknowledged that she did not see any fur on the hood of the [petitioner's] jacket. She agreed that Davis' jacket had a zipper all the way around the hood but no fur.

Andreana Breveard, a property supervisor with the Davidson County Sheriff's Office, testified that she collected the [petitioner's] clothing when he was booked at the sheriff's office on January 20, 2011. His clothing included a black, hooded jacket, black pants, gray tank top, black shirt, and black shoes.

Lorita Marsh, a police identification supervisor with the MNPD, testified that she had been a latent print examiner since 1995. She said that some of the latent fingerprints submitted to her in the case were of no value for comparison, but she was able to determine that a palm print lifted from the carton of Newport cigarettes and a thumbprint lifted from one of the opened packs of Newport cigarettes found in the suspect vehicle matched the [petitioner's] prints. On cross-examination, Marsh agreed that someone

else could have handled the carton of cigarettes and "not gotten a print picked up."

The [petitioner] elected not to testify and rested his case without presenting any proof.

*State v. Dale Samuel Waggoner*, No. M2013-00731-CCA-R3-CD, 2014 WL 1354938, at *1-3 (Tenn. Crim. App. Apr. 4, 2014), *perm. app. denied* (Tenn. Sept. 2, 2014). After its review, this Court upheld the petitioner's convictions.

The petitioner then filed a pro se petition for post-conviction relief, alleging trial counsel was ineffective in handling the petitioner's case both prior to and during trial. After the appointment of counsel, the petitioner filed an amended petition for post-conviction relief wherein he further specified his allegations against trial counsel. The petitioner alleged trial counsel failed to adequately prepare for trial in that he did not familiarize himself with the applicable laws and he failed to "properly investigate relevant issues in [the] case." The petitioner further asserted trial counsel "failed to properly interview" him, failed to counsel and advise him of the elements of the charged offenses, failed to learn the petitioner's "state of mind during the commission of the crime," failed to advise him of his right to testify or not testify, and "failed to properly explain [the] process of trial, review discovery, or explain the penalties of the convicted crimes."

At the post-conviction hearing, trial counsel stated the petitioner's family hired him approximately five months prior to trial.[1] Over those five months, trial counsel met with the petitioner during his court appearances on June 14, 2012, October 5, 2012, and November 2, 2012. He met with the petitioner an additional three times, including a "meet and greet" followed by two "fairly lengthy discussions." During the meetings, trial counsel explained trial procedure, detailed the elements of the charged offenses and the State's burden of proof regarding the same, provided his opinion on the strength of the State's case, and reviewed discovery with the petitioner.

After reviewing the discovery, trial counsel developed a defense theory which rested on misidentification. Trial counsel explained, "[i]n a robbery case when the person who is being robbed who is three feet away from the person who is trying to rob them can't identify them properly or accurately in a lineup, I found that [to be] a glaring hole." Regarding specific evidence at issue in the trial, trial counsel explained he did not

---

[1]Prior to hiring trial counsel, the petitioner was represented in general sessions by different counsel who was also appointed to the petitioner's case on direct appeal. The petitioner makes no claims of ineffective assistance against his general sessions/appellate counsel.

know prior to trial that the $2 bill found on the petitioner after his arrest was stamped with the Mapco store number. As such, he did not discuss this fact with the petitioner prior to trial. However, trial counsel noted he and the petitioner did discuss how the State would utilize certain identifying pieces of evidence against him, including the clothing worn by the petitioner during the crimes, the $2 bill found on the petitioner after his arrest, and the gun, which was owned by the petitioner and "was all over the video." Additionally, because video evidence of the crime existed and it was "fairly straight forward," trial counsel did not utilize a private investigator in preparing for trial.

Prior to trial, however, trial counsel discussed settlement offers with the petitioner "on a couple of occasions because [trial counsel] thought it was a huge risk for him . . . with his history" to go to trial. Specifically, trial counsel recalled a fifteen-year offer, not an eight-year offer, but acknowledged "it may have been that low." Trial counsel also did not remember a twelve-year offer at eighty-five percent but stated, [i]f that's what it was, I'm sure that's what I presented to [the petitioner]."

Trial counsel acknowledged the State filed a notice of enhanced punishment and impeachment evidence identifying several of the petitioner's prior convictions. Based upon two prior felony convictions, trial counsel believed the petitioner was a Range I offender prior to trial. However, upon being convicted of the two present felonies, trial counsel thought the petitioner's offender status shifted to Range II. As such, upon conviction, trial counsel stated the petitioner was exposed to an additional twelve years in sentencing as a Range II offender. Based upon the petitioner's criminal history, trial counsel advised him against testifying at trial. Trial counsel acknowledged the petitioner did testify at his sentencing hearing.

The petitioner then testified, stating he met with trial counsel in jail "maybe once or twice." The petitioner indicated trial counsel failed to explain the trial process "how [the petitioner] believe[d] he should have," noting trial counsel failed to discuss the evidence against him or the elements the State was required to prove at trial. When asked if he and trial counsel reviewed discovery or discussed the strength of the State's case against him, the petitioner claimed, "[n]ot so much." The petitioner stated trial counsel did not discuss lesser-included offenses with him or the punishments they carried. Furthermore, the petitioner indicated trial counsel failed to explain the misidentification theory to him but admitted trial counsel mentioned the victim "identif[ied] someone else."

The petitioner remembered trial counsel conveying a settlement offer of "an eight at eighty-five percent," but could not recall if trial counsel believed it was a good offer. The petitioner stated trial counsel "wasn't sure" if he would be classified as a Range I or Range II offender. As such, trial counsel only discussed the sentencing range applicable

to a Range I offender with him prior to trial. The petitioner stated he would have considered the applicable sentencing range he faced as a Range II offender in deciding whether to accept a plea deal had he been advised of the same by trial counsel.

The petitioner acknowledged trial counsel advised him of his testimonial rights and stated trial counsel "said it wasn't in [his] best interest" to testify at trial. The petitioner could not recall why he testified at his sentencing hearing, but stated trial counsel failed to advise him of the effect his testimony would have on his case moving forward. The petitioner stated if he had known of the effect his testimony might have on his case, he would not have testified at the sentencing hearing.

During cross-examination, the petitioner acknowledged he hired trial counsel on June 14, 2012, approximately five months prior to trial. The petitioner stated trial counsel met with him in jail, but they did "[n]ot really" discuss his case. The petitioner again stated trial counsel told him not to testify. However, he did not remember the trial court advising it would allow five prior convictions into evidence if he chose to testify. Additionally, the petitioner did not remember the *Momon* colloquy led by the trial court or signing a waiver regarding the same.

After its review of the evidence presented, the post-conviction court denied relief and this timely appeal followed.

### *Analysis*

On appeal, the petitioner asserts the outcome of his trial and best interest plea would have been different absent the deficiencies of trial counsel. Specifically, the petitioner argues trial counsel failed to adequately communicate with him or to prepare for trial, failed to explain the "trial process and penalties for the crimes charged," and failed to properly advise him of his right to testify at trial. The State contends the post-conviction court correctly denied the petition as the petitioner failed to prove his factual claims by clear and convincing evidence. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of

counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, the petitioner alleges trial counsel was ineffective by failing to meaningfully communicate with him or to prepare his case for trial. Within this context, the petitioner asserts several specific failures, including that trial counsel failed to explain the trial process to him and failed "to discuss with him the penalties for the offenses in which he was charged." The petitioner contends trial counsel's misunderstanding as to the petitioner's offender status "crippled the plea negotiations and did not give [the petitioner] a realistic outcome as he weighed his options between an eight-year offer to serve at eighty-five percent or whether he should risk going to trial." The petitioner also claims trial counsel "crippled" his defense "by relying solely on the 'misidentification' theory." Separately, the petitioner claims trial counsel failed to advise him of his right to testify or not testify at trial, arguing his testimony "would have assisted his defense and led the jury to a different result." The record, however, fails to support any of the petitioner's claims.

In denying relief, the post-conviction court first addressed the petitioner's allegation that trial counsel failed to effectively communicate with him or to prepare his case for trial. The post-conviction court stated, "[n]o evidence has been presented to this [c]ourt to substantiate [the] [p]etitioner's allegation that [t]rial [c]ounsel failed to be aware of the law applicable to [the] [p]etitioner's trial" and "[n]othing in the record indicates that [t]rial [c]ounsel failed to meet with the petitioner and keep him informed of the proceedings." We agree. The record shows trial counsel met with the petitioner at least six times in the five months preceding trial. Trial counsel noted two of the meetings were particularly long during which they discussed discovery, the elements of the charged offenses, the State's burden of proof, trial procedures, trial strategies, the petitioner's testimonial rights and trial counsel's opinion regarding the same, the strength of the State's case, and the plea deals offered by the State. The post-conviction court accredited trial counsel's testimony and nothing in the record preponderates against its factual findings. *See Tidwell*, 922 S.W.2d at 500.

Furthermore, at the post-conviction hearing, the petitioner admitted he and trial counsel discussed many of the above topics and further offered only vague descriptions of his meetings with trial counsel in support of his claims. The petitioner also failed to provide any facts demonstrating how trial counsel "crippled" his case by relying on misidentification as a defense at trial. As such, the petitioner has failed to provide evidence detailing trial counsel's alleged failure to communicate with him or to adequately prepare his case for trial. The petitioner is not entitled to relief.

Regarding the petitioner's sentencing exposure at trial, both trial counsel and the petitioner explained trial counsel "wasn't sure" if the petitioner was a Range I or Range II offender. The post-conviction court addressed this issue, as follows:

Trial [c]ounsel admitted at the post-conviction hearing that he was not sure whether the [p]etitioner met Range I or Range II classification prior to trial, and that he advised the [p]etitioner [of] the same. The [p]etitioner corroborated that his [t]rial [c]ounsel advised he was not certain about the classification range. Both parties, however, testified that prior to trial the State offered a sentence of 8 years to serve at the Tennessee Department of Correction with 85% release eligibility. [The] [p]etitioner rejected that offer and pursued a trial. Although [t]rial [c]ounsel misadvised the [p]etitioner that he may be considered as a Range I offender, this [c]ourt takes judicial notice that the State's 8-year offer was at the lower end of the Range I sentencing range (8-12 years) and that it is not disputed that [the] [p]etitioner was advised he may be sentenced within the Range [II] category should he be convicted at trial. While [t]rial [c]ounsel misadvised the [p]etitioner that his convictions from his instant trial would count towards his history and bump him to Range II, the [c]ourt credits [t]rial [c]ounsel's testimony that [the] [p]etitioner was made aware that if he proceeded to trial he would be sentenced as a Range II Offender (12-20 years). Here, the [p]etitioner was sentenced in the middle of the range with 18 years. Accordingly, the [c]ourt finds that this error does not qualify [the] [p]etitioner to a new trial.

In reviewing the record before us, we again agree with the post-conviction court. Though the petitioner asserts trial counsel only advised him of the sentencing range applicable to a Range I offender, the petitioner has failed to provide clear and convincing evidence to support his factual contention. Rather, the record indicates trial counsel informed the petitioner of the potential punishment associated with a Range II offender status after which the petitioner chose to proceed to trial. Specifically, after having been informed by trial counsel that he faced a potential sentencing range of twelve to twenty years as a Range II offender, the petitioner rejected the initial settlement offer of eight years, a minimum Range I sentence. Tenn. Code Ann. §§ 40-35-112(a)(2), -112(b)(2). The record further indicates the petitioner rejected all of the plea deals conveyed by trial counsel prior to trial, including the eight-year offer, despite trial counsel's advice regarding the risks of trial in light of the petitioner's criminal history and the potential Range II punishment he faced. Accordingly, the petitioner cannot prove prejudice resulting from this claim. *Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief.

Finally, the post-conviction court also reviewed the petitioner's claim alleging trial counsel failed to advise him of his testimonial rights at trial. In denying relief as to this claim, the post-conviction court found the petitioner signed a waiver of his testimonial

rights despite the petitioner not remembering the same. The post-conviction court further determined trial counsel reviewed the pros and cons of the petitioner testifying at trial with the petitioner and also noted "[the] [p]etitioner conceded that [t]rial [c]ounsel advised him not to testify although he could not recall any other information during his cross-examination." Our review of the record supports the post-conviction court's findings as it is clear in the record trial counsel discussed the petitioner's testimonial rights with him during their pre-trial meetings. Further, the record indicates trial counsel advised the petitioner against testifying based upon the State's ability to impeach him, and the petitioner admitted to the same. The petitioner is not entitled to relief.

As detailed above, no evidence exists in the record to support the petitioner's attack on trial counsel's performance or how the alleged deficient performance affected the outcome of his trial. *See Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

- 11 -